UNITED STATES of America,
Plaintiff-Appellant,

v.

CITY OF ALBUQUERQUE et al.,
Defendants-Appellees.

No. 75–1557.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 19, 1976.

Decided Nov. 29, 1976.

Dennis J. Dimsey, Atty., Dept. of Justice, Washington, D.C. (Victor R. Ortega, U. S. Atty., Albuquerque, N.M., J. Stanley Pottinger, Asst. Atty. Gen., and Brian K. Landsberg, Dept. of Justice, Washington, D.C., on the brief), for plaintiff-appellant.

Chris Lucero, Jr., Santa Fe, N.M. (James A. Thompson, Albuquerque, N.M., on the brief), for defendants-appellees.

Before McWILLIAMS and BREITEN-STEIN, Circuit Judges, and ZIRPOLI*, District Judge.

McWILLIAMS, Circuit Judge.

This is an action brought by the United States against the City of Albuquerque and its fire chief for alleged religious discrimination in its employment practices within the city fire department, in violation of 42 U.S.C. § 2000e–2. One Salomon Zamora, a fireman first class in the Albuquerque fire department, was discharged after he (Zamora) failed to report for work on the day shift for Saturday, October 28, 1972. Zamora, a Seventh Day Adventist, had refused to appear for work on October 28, 1972, because such, in his view, would have violated one of the practices of his particular religion which forbade working on the Sabbath, except for emergencies. The Sabbath as observed by the Seventh Day Adventists is from sundown Friday until sundown Saturday. By answer the City of Albuquerque admitted Zamora's discharge but denied that such discharge resulted from any discrimination against Zamora.

The Honorable Edmund L. Palmieri, Senior Judge for the Southern District of New York, sitting by designation in the United States District Court for the District of New Mexico, heard the case and after a two-day trial found in favor of the City of Albuquerque and dismissed the action. The trial judge's memorandum opinion was elaborate and in great detail, containing a preliminary statement, 69 findings of fact and 17 conclusions of law. That opinion is now reported at 9 Employment Practices Decisions ¶ 10,182 and the reader is referred to that opinion for the background facts out of which the present controversy arises. Such background material will be developed in the present opinion only insofar as is necessary to an understanding of our disposition of the matter.

We are here concerned with two sections of the Civil Rights Act of 1964, as amended, namely 42 U.S.C. § 2000e–2 and 42 U.S.C. § 2000e(j). The former section reads in pertinent part as follows:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

Section 2000e(j) provides as follows:

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is *unable to reasonably accommodate* to an employee's or prospective employee's religious observance or practice *without undue hardship* on the conduct of the employer's business. (Emphasis added.)

In his memorandum opinion the trial judge commented that there was ample evidence to indicate that the real reason Zamora was discharged was his own "intransigence" and that he had not been discharged because of his religion. However, the trial judge did not rest his decision on that ground and proceeded to apply to the factual situation then before him the provisions of 42 U.S.C. § 2000e(j). In this regard the trial court found that the City of Albuquerque made reasonable accommodations to Zamora's religious practices and that further and additional accommodation would have resulted in an undue hardship on the business of the fire department. In our view these findings are not clearly erroneous and it is on this basis that we affirm. Fed.R.Civ.P. 52(a). Upon review of the record we cannot say with a definite and firm conclusion that a "mistake" was committed by the trial court. *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The issues before the trial court were not ones which

* Of the Northern District of California, sitting by designation.

were open and shut, but on the contrary were ones upon which reasonable minds could well differ. In such circumstance the trial court's findings should stand. Brief reference to the facts will put the matter in focus.

Zamora joined the Seventh Day Adventist Christian Church in 1961. In 1968 Zamora and his wife were divorced, and he was disfellowshipped from his church. In March 1969 Zamora became a member of the Albuquerque Fire Department. At the time of his employment Zamora was not a member of the Seventh Day Adventists, and he indicated in his application that he could work any day of the week, and apparently did work whichever shift he was called on until around September 1971. At this time Zamora remarried his former wife and he thereafter rejoined his church.

As indicated above, one tenet of the Seventh Day Adventist is that he observe the Sabbath Day, which commences at sundown on Friday and ends at sundown on Saturday. "Observe" means to refrain from unnecessary work on the Sabbath, although a Seventh Day Adventist may engage in so-called "emergency" work on that day. Just what constitutes "emergency" work is apparently a matter between the member and his God. However, the present case does not turn on this distinction between unnecessary work and emergency work.

Zamora, a fireman first class, was assigned to Division 1 of the Fire Suppression Department, which works on a 56-hour work week. The day shift is from 8:00 a. m. to 6:00 p. m., and the night shift is from 6:00 p. m. to 8:00 a. m. The work force at Division 1 is divided into three platoons: A, B, and C, which rotate on the basis of working three consecutive day shifts, next working three night shifts, and then having three days off. Consequently, no fireman has the same days off each week, since a nine-day work cycle is imposed on a seven-day week.

On the work schedule outlined above, Zamora would be called on to work either the Friday night shift or the Saturday day shift some 35 times in a year. A minor problem did arise in connection with the Friday day shift, since in winter the sun would set before the end of the Friday day shift, i. e. 6:00 p. m. Similar problems arose in summer when sundown did not occur until sometime after the Saturday night shift commenced. However, there was no particular problem in this connection as Zamora, with the apparent approval of his superior, was in each instance, though on duty, not required to perform so-called menial work after sundown on Friday, nor before sundown on Saturday. The present controversy, then, stems from those occasions when Zamora was called on to work either the Friday night shift or the Saturday day shift.

From October 1971 until October 1972, Zamora used sick leave some 13 times in order to avoid working Friday nights or Saturday days. During this period he also took annual leave several times and he traded shifts once in order to avoid work on his Sabbath. However, in early September 1972, the matter of Zamora's not working on Friday nights or Saturday days became a subject of dialogue between Zamora and his supervisors in the fire department. Whether Zamora himself brought up the question, or whether the matter surfaced when Zamora, after taking sick leave, was not found at his home, but in church one Saturday morning, is not really material. In any event both Zamora and his supervisor, after discussion, agreed that it was a misuse of sick leave to take sick leave, when he was not in fact ill, in order to avoid working Friday nights and Saturday days.

On October 9, 1972, Zamora submitted a request for unscheduled vacation leave for the day shift on Saturday, October 28, 1972. On October 23, 1972, this request was denied, the assigned reason therefor being that if the request were granted, District 1 would be undermanned on that particular date. Two other firemen and a lieutenant, who, prior to Zamora, had similarly applied for unscheduled vacation, were also denied leave for the same reason. However, these men obtained time off on October 28, 1972, by trading shifts. Zamora's request for un-

scheduled leave on October 28, 1972, was kept open, even though denied on the 23rd, in order to allow the request to still be granted if a vacancy occurred. However, none developed and on October 27, 1972, at approximately 5:30 p. m. he was formally notified that his request for unscheduled leave for October 28, 1972, had been finally denied. Zamora at that time informed his superior that he would not report for work on October 28, 1972, and he did not. Thereafter Zamora was suspended and eventually he was discharged for such absence. Prior to the actual discharge there was discussion back and forth between Zamora and the fire chief, with the latter urging Zamora to reconsider and try to work it out within the rules and regulations of the department. Zamora remained adamant and his formal discharge followed.

As indicated above, the trial judge found that the City of Albuquerque had attempted to make reasonable accommodations to Zamora's religious practices and that such reasonable accommodations were in fact embodied in the rules and regulations of the fire department. In this regard there was a rules committee in the City's fire department, which consisted of one member from each rank in the department, which committee worked in conjunction with the fire chief. If the committee and the chief agreed on a rule or regulation, it was adopted. In the case of a disagreement between the committee and the chief, the matter was referred to a personnel director, who was the final authority.

Under the rules and regulations of the Albuquerque Fire Department there were three ways in getting time off, i. e., not having to work an assigned shift. These were using a day of one's vacation leave, taking leave without pay, and trading shifts with another fireman of the same rank. There were some minor restrictions on getting time off. For example, there was a minimum manning level and if a request for time off would mean going below that level, the request would be denied. But on the whole, the trial court found, and we agree, that the fire department had a fairly liberal time off policy, both in actual practice and as concerns the rules and regulations themselves. It is true that Zamora testified that he had never had much luck in trading shifts with other firemen. His testimony, however, was countered by several firemen who testified as defense witnesses that they also worked in Division 1 and that they frequently traded shifts, and would have traded with Zamora, but that they were never asked. In this latter regard the record indicates that for some reason Zamora was indeed reluctant to ask others to trade shifts and his ultimate position, as well as that of counsel in this appeal, is that it was up to his supervisor to take the initiative and find another fireman for him who would trade shifts. For understandable reasons, the policy within the department was for the firemen to arrange their own trade-offs, as the supervisors did not want to be in the position of coercing trade-offs.

The record also indicates, as above referred to, that Zamora's supervisors were quite reluctant to be forced into the position where Zamora would inevitably be discharged for insubordination, i. e., refusing to report for work when ordered. Zamora was constantly urged by his supervisors to "work it out" within the existing rules of the department, even after he failed to report for work on October 28, 1972. And it was in this general setting that Zamora became "intransigent," as the trial court characterized it, and demanded that he never be required to work on a Friday night shift or a Saturday day shift. His supervisors stated that under the existing rules and regulations they could not give in to this demand and when he then refused to report for work on October 28, 1972, discharge followed.

Did the City of Albuquerque and its fire department demonstrate that they had, through their rules and regulations, made reasonable efforts to accommodate Zamora's religious practices and that further accommodation would result in undue hardship? The trial court found and concluded

that such had been "convincingly demonstrated." We think such finds support in the record.

In *Williams v. Southern Union Gas Co.,* 529 F.2d 483, 489 (10th Cir.), *cert. denied,* —— U.S. ——, 97 S.Ct. 381, 49 L.Ed.2d —— (1976), we stated that the phrases "reasonably accommodate" and "undue hardship" as used in 42 U.S.C. § 2000e(j) are relative terms and cannot be given any hard and fast meaning. Each case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably. Here the employer did not stubbornly insist that Zamora work on his Sabbath, come what may. On the contrary, as a result of interaction between the fire chief and the rules committee, made up of representatives of the firemen, rules and regulations were promulgated which granted a fireman considerable latitude in getting excused from reporting for work for a particular shift assignment. A fireman could use up a portion of his leave with pay, if he be so inclined. Or he could simply take leave without pay. When an employee for personal reasons simply prefers not to work on a given day, it is not too much to suggest that he receive no pay for the shift he does not work. And, perhaps most importantly, firemen were permitted to trade shifts with other firemen of the same grade. Trading shifts was a prevalent practice, even though Zamora was himself not particularly interested in trading shifts with others. By trading shifts, a fireman would of course suffer no loss in pay. But Zamora would have none of this. He wanted Friday nights and Saturday days off as a matter of right. We conclude that the trial court's finding that the City of Albuquerque made reasonable accommodation efforts is not clearly erroneous and should not be overturned by us.

■ The trial court also concluded that if the City made further efforts to accommodate Zamora there would be "undue hardship" on the "business." The "business" was that of fire suppression, and such is obviously a matter of great public interest. In our view when the "business" of an employer is protecting the lives and property of a dependent citizenry, courts should go slow in restructuring his employment practices. *Harper v. Mayor and City Council of Baltimore,* 359 F.Supp. 1187, 1205 (D.C. Md.), *modified on other grounds sub nom. Harper v. Kloster,* 486 F.2d 1134 (4th Cir. 1973).

■ But beyond its rules and regulations, just what could the City have done to accommodate Zamora's religious practices? The City of course could have given in and set up a schedule that would never have called on Zamora to work any Friday night or Saturday day shift. Counsel says such might have "inconvenienced" the City, but would not have really amounted to "undue hardship." However, the trial court concluded that such scheduling to fit Zamora's demands would have amounted to undue hardship. The trial court's pertinent conclusions on this particular matter are worthy of note and read as follows:

9. Further accommodation, as suggested by the United States, would impose an undue hardship on the Albuquerque Fire Department in any of several ways: by inflicting an unjustified financial burden upon it; by compelling other firemen to accept less favorable working conditions; by forcing a reduction in the Defendant Department's fire fighting efficiency; by imposing onerous and complex scheduling problems upon it.

12. A blanket grant of Sabbaths off or substituting Sunday duty would still leave Zamora's scheduled Sabbath shift undermanned. An extra fireman might have been required either from another station, possibly leaving that station short-handed, or from among firemen not scheduled for duty—causing someone to work overtime at premium wages and possibly requiring the replacement to work 38 or 34 hours straight. . . .

13. . . . One indication of whether such an accommodation can reasonably be made or whether it will work such a

hardship is whether the employer has been or is now willing to make such accommodations for other employees similar to that which the Plaintiff demands . . . . The Fire Department of the City of Albuquerque has never allowed firemen to be absent from duty except by the regularly provided procedures . . . .

14. The serious public life-saving and property protecting nature of the Department's function and the strict manning and budgetary limits under which it operated prevented the Department from allowing the firemen off upon demand or reshuffling schedules made up in advance on a six month basis in order to avoid scheduling one employee on Fridays and Saturdays, especially in a situation in which all employees are scheduled on a rotating three day shift. . . .

15. If the Albuquerque Fire Department falls below manning requirements, the obvious result is a greatly magnified risk to the citizens of the City of Albuquerque of loss of life and destruction of property, as well as an increased risk of harm to the firemen themselves. The cost of accommodating any vacancies in the established work schedule must be met from public funds. Therefore, any further accommodation by the Fire Department to Salomon Zamora's demands would have been in excess of the accommodation contemplated by Congress and would have constituted an undue hardship.

We regard the trial court's several conclusions as to "undue hardship," as well as its earlier determination of "reasonable accommodation," to be essentially findings of fact. On review such should be accepted unless they be deemed clearly erroneous. In our review such are not clearly erroneous and hence should be upheld.

In arguing for reversal and the entry of a judgment in favor of Zamora, counsel relies on such cases as *Draper v. U. S. Pipe & Foundry Co.,* 527 F.2d 515 (6th Cir. 1975); *Hardison v. Trans World Airlines, Inc.,* 527 F.2d 33 (8th Cir. 1975), *cert. granted,* ——

U.S. ——, 97 S.Ct. 381, 50 L.Ed.2d 325 (1976); *Cummins v. Parker Seal Co.,* 516 F.2d 544 (6th Cir. 1975) *aff'd by an equally divided Court,* —— U.S. ——, 97 S.Ct. 342, 50 L.Ed.2d 223 (1976); *Reid v. Memphis Publishing Co.,* 468 F.2d 346 (6th Cir. 1972); and *Riley v. Bendix Corp.,* 464 F.2d 1113 (5th Cir. 1972). We recognize that the problems arising from the fact that Seventh Day Adventists are forbidden to work on Saturdays are troublesome ones and that the courts have not been in accord in their thinking on the subject. For cases holding that the employer had made reasonable accommodation efforts to Seventh Day Adventists, and upholding their discharge upon a refusal to work on Saturdays, see *Williams v. Southern Union Gas Co.,* 529 F.2d 483 (10th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 381, 50 L.Ed.2d 325 (1976); *Reid v. Memphis Publishing Co.,* 521 F.2d 512 (6th Cir. 1975), *cert. denied,* 45 U.S.L.W. 3361 (U.S. Nov. 16, 1976) (No. 75–1105); and *Dewey v. Reynolds Metals Co.,* 429 F.2d 324 (6th Cir. 1970), *aff'd by an equally divided Court,* 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971).

A reading of all these cases leads us to conclude that to a very great degree each case turns on its own particular facts and circumstances. Under the facts and circumstances here present, if we reversed the trial court we would simply be substituting our best judgment of the facts for that of the trial court. This we should not do. Indeed we cannot. *Williams v. Southern Union Gas Co.,* supra.

Judgment affirmed.